IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

KATHY A. CHAPINS,                      )
                                       )
        Plaintiff,                     )        Case No. 5:16-cv-00031
                                       )
v.                                     )
                                       )
NORTHWESTERN COMMUNITY )        By:     Michael F. Urbanski
SERVICES BOARD,                        )                United States District Judge
                                       )
        Defendant.                     )

## MEMORANDUM OPINION

This is an employment dispute. Plaintiff Kathy A. Chapins brings claims against her

former employer, Northwestern Community Services Board ("Northwestern"), of retaliation

and age discrimination under the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq., and

the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq.,

respectively. Before the court is Northwestern's motion for summary judgment. ECF No.

17. The matter has been fully briefed, and the court heard oral argument on March 3, 2017.

For the reasons set forth below, the court finds that Chapins has failed to establish a genuine

issue of material fact, and Northwestern is entitled to judgment as a matter of law on both

counts. Accordingly, the court **GRANTS** Northwestern's motion for summary judgment

(ECF No. 17). Northwestern's Motion in Limine (ECF No. 26), is **DENIED as moot**.

### I.

Defendant Northwestern oversees "an array of outpatient, case management, day

support, residential and emergency programs" designed to help adults and children combat

addiction, mental illness, and emotional/behavioral disorders. What we do for you and your family, Northwestern Community Services (last visited Mar. 3, 2017), http://www.nwcsb.com/aboutus.php. Chapins began her employment at Northwestern in 2003, and from February 2011 through June 13, 2014 worked as the Office Manager at Northwestern's Shenandoah County Youth Services Center. ECF No. 1, ¶ 8. In February 2011, "Chapins reported her suspicions" that a coworker, Clare Matthews, had submitted false Medicaid claims and timesheets to her supervisor, Barbara Kibler.[1] Id. ¶ 10. As a result, Matthews was suspended, and later terminated after her position was eliminated. Id. ¶ 11. After reporting Matthews, Chapins claims she experienced harassment at the hands of Matthews' subordinates, resulting in Chapins' hospitalization due to stress in July 2011. Id. ¶ 12. Chapins argues that Kibler and Chief Operations Officer Mark Gleason mischaracterized this harassment as a "relationship problem," and threatened her with transfer or termination if she could not resolve her differences with her coworkers. Id. ¶ 13. As a result, in December 2011, Chapins filed a grievance against Gleason; Chief Financial Officer David Toth subsequently dismissed her grievance, and assured her "there was no threat of termination or transfer." Id. ¶¶ 14, 16. Subsequently, however, Toth retired, and, according to Chapins, "Gleason resumed his campaign of hostility." Id. ¶ 17.

In spring 2014, Northwestern discontinued the Therapeutic Day Treatment Program (the "TDT program"), on which Chapins worked.[2] Id. ¶ 18. Chapins, along with thirty-three

---

[1] Chapins' complaint speaks only of reporting Matthews. In their depositions, however, Chapins and Kibler also note that Chapins reported the potential fraud of Julie Ebersole, another coworker. See, e.g., Chapins Dep. Tr., ECF No. 25, at 52:21–53:2 ("Did you also report Julie Ebersole? A: Yes, I did."). Because Chapins does not argue that her report of Ebersole was also protected conduct, the court does not focus on the Ebersole report.

[2] There is a factual dispute as to whether Chapins' position was funded exclusively through the TDT program or through all the programs she supported. Northwestern has proffered exhibits which support its claim that Chapins'

2

others, were terminated when the TDT program was discontinued. Id.; see ECF No. 18, at 11. After receiving her termination notice, Chapins applied for a different position (the "Office Manager II position"). ECF No. 1, ¶ 20. Kibler delayed the hiring process to allow Chapins and her coworker, Sarah Clark, to apply. ECF No. 18, at 15; see Kibler Dep. Tr., ECF No. 24, at 45:19. In fact, Chapins and Clark were the only applicants; both interviewed, and both received high scores on their interview evaluations. ECF No. 18, at 15. However, Chapins alleges that her interview, conducted by Gleason and Kibler, was "hostile, intimidating and antagonistic." ECF No. 1, ¶ 21. Ultimately, Chapins was not chosen for the position, and Clark, seventeen years her junior and thus not within the class of protected persons under the ADEA, was. Id. ¶¶ 22, 25.

Chapins filed suit in May 2016. She first alleges that Northwestern retaliated against her for reporting Matthews: "Chapins was threatened, harassed, terminated and not selected for a position for which she was the more qualified applicant by Northwestern in violation of the [FCA]." Id. ¶ 29. Second, Chapins alleges that Northwestern discriminated against her on account of her age, in violation of the ADEA, "by selecting a lesser qualified applicant of a non-protected status for the Office Manager [II] position." Id. ¶ 33. In response, Northwestern answered, ECF No. 5, before filing a motion for summary judgment on January 25, 2017. ECF No. 17.

---

salary was funded entirely through the TBT program. E.g. ECF No. 18-3, at 1 (Declaration of Catherine Russell, Chief Financial Officer for Northwestern) ("All of Ms. Chapins salary and benefits were paid out of the Therapeutic Day Treatment Program."); id. at 5 (Chapins' check history, reflecting code "70150," which corresponds to the TBT program). Nonetheless, Chapins asserts that "the cost of her position had been divided equally among all of the programs that she supported." ECF No. 19, at 3. As will be discussed, this factual dispute is not material to the resolution of Chapins' claims. See infra p. 16 n.9.

3

# II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., No. 13-2044, 2014 WL 2871492, at *1

4

(4th Cir. June 25, 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 477 U.S. at 255. However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). Instead, the non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (citing Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

## III.

The court first considers Chapins' FCA claim. The anti-retaliation provision of the FCA prohibits adverse action against employees because of "lawful acts done . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h). To establish retaliation, a plaintiff must show (1) she engaged in "protected activity," (2) her employer knew about that activity; and (3) her employer took action against her as a result. Glynn v. EDO Corp., 710 F.3d 209, 214 (4th Cir. 2013).

Northwestern argues it is entitled to summary judgment on the first and third requirements. First, reporting Matthews for discrepancies in her timesheets does not

5

constitute protected activity because "there is no evidence in the record that [Northwestern], the employer, had or intended to commit a fraud against the government." ECF No. 18, at 9. As to the third requirement, Northwestern argues that its conduct "neither occurred within the [statutory] limitations period nor rises to the level of retaliation[,] and that the decisions with respect to [Chapins'] termination and non-selection for an office manager position were based on legitimate business reasons unrelated to [Chapins'] reports three years earlier." Id. at 9–10. Though Chapins likely engaged in protected conduct when she reported Matthews' for inaccurate billing, the court agrees that Chapins has failed to show that a reasonable jury could find that Northwestern retaliated against her. Because all three elements are necessary to establish a retaliation claim, this failure compels the grant of summary judgment to Northwestern.

## A. Protected Activity

Congress amended 31 U.S.C. § 3730(h) in 2010 by adding "efforts to stop 1 or more violations" of the FCA as protected activity under the statute. Thus, employee action is protected if it is taken (1) "in furtherance of an action" under the FCA, or represents (2) "other efforts to stop 1 or more" FCA violations. 31 U.S.C. § 3730(h). Proof that the FCA has been violated is not necessary to establish protected activity. Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409, 416 n.1 (2005). In fact, in some circumstances, § 3730(h) "protects an employee's conduct even if the target of an investigation or action to be filed [is] innocent." Id. at 416.

Activity is protected under the first prong if it meets the "distinct possibility" standard. Mann v. Heckler & Koch Def., Inc., 630 F.3d 338, 344 (4th Cir. 2010); Layman v.

6

MET Labs, Inc., No. RDB-12-2860, 2013 WL 2237689, at *7 (D. Md. May 20, 2013).

"Under this standard, protected activity occurs when an employee's opposition to fraud takes place in a context where 'litigation is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when . . . litigation is a reasonable possibility.'" Mann, 630 F.3d at 338 (ellipsis in original) (quoting Eberhardt v. Integrated Design & Const., Inc., 167 F.3d 861, 869 (4th Cir. 1999)).

The second prong ("other efforts to stop" FCA violations) protects a wider range of activity. Carlson v. DynCorp Int'l LLC, 657 F. App'x 168, 171 (4th Cir. 2016); see Smith v. Clark/Smoot/Russell, 796 F.3d 424, 434 (4th Cir. 2015) (second prong "plainly encompasses more than just activities undertaken in furtherance of a False Claims Act lawsuit"). In Carlson, the plaintiff argued he was retaliated against for his efforts to stop an FCA violation by his employer. 657 F. App'x at 168–69. The court "assume[d], without deciding," that "efforts to stop 1 or more violations" are "protected activity where those efforts are motivated by an objectively reasonable belief that the employee's employer is violating, or soon will violate, the FCA."[3] Id. at 172.

Northwestern argues Chapins cannot prevail under either prong; because "there is no evidence that [Chapins] intended to file a qui tam suit," her actions cannot have been taken "in furtherance of" an FCA action. ECF No. 18, at 8. Moreover, under the second prong, Northwestern argues that Chapins cannot have had a reasonable, good faith belief that it

---

[3] This "objectively reasonable standard" was applied by other circuits to the pre-amendment version of § 3730(h). Id. (citing cases from the Sixth, Seventh, Eighth, and Ninth Circuits). Moreover, the "objectively reasonable" standard "does not substantially depart" from the "distinct possibility" standard: a distinct possibility of litigation "requires that protected activity relate to company conduct that involves an objectively reasonable possibility of an FCA action." Id. at 172 n.* (internal quotation marks omitted) (quoting Mann, 630 F.3d at 338). Thus both standards are closely related: a plaintiff who acts on an objectively reasonable basis will be protected by the FCA.

would have violated the FCA, because, "once [Chapins] reported her initial concerns, she learned of the various efforts to prevent [fraudulent billing] and was requested to assist in verifying time for employees of the TDT program." Id. at 9 (footnote omitted). The court disagrees.

Even accepting that, once Chapins reported Matthews, she was confronted with incontrovertible proof that Northwestern would not submit fraudulent bills to the government, this still does not rebut Chapins' contention that she harbored an objectively reasonable belief that an FCA violation might occur before and during the process of reporting Matthews. The FCA does not define protected conduct so narrowly; in particular, protected conduct does not lose this status simply because the whistleblower later learns information that disproves her belief in an FCA violation. Instead, to be protected as a whistleblower, Chapins need only "evince some attempt to expose possible fraud," and provide "some suggestion of impropriety or illegality by the employer." United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co., 612 F.3d 724, 735 (4th Cir. 2010).

Chapins meets this burden: viewing the facts in her favor, she has demonstrated a good faith, objectively reasonable belief in potential fraud against the government. Chapins "reported her suspicions" that Matthews "submitted false claims for Medicaid and false timesheets to her direct [s]upervisor, Barbara Kibler." ECF No. 19, at 2. These suspicions were based on "numerous instances of inaccurate documentation being submitted for Medicaid reimbursement," which Chapins had observed for "a couple of years, . . . minimum." Chapins Dep. Tr., ECF No. 25, at 20–21. When asked for examples, Chapins responded,

> [T]here's no way that I can recall the countless situations that
> were dishonest from her. She would sign off on documentation,
> for instance, that—and then allow it to be billed knowing that
> she had never met the requirements that Medicaid set forth for
> that particular document. That happened countless times, way
> too many for me to recall.
> . . .
> She would lie to her supervisor. Q: About what? A: Everything,
> where she was, what time she was there, what she was doing,
> and the list goes on.

Id. at 20:21–21:17. Most importantly, there is no suggestion in the record that, during her

investigation of Matthews' conduct, Chapins was aware of Northwestern's internal auditing

procedures, or any other facts that would suggest that Matthews' fraudulent claims would

not be passed on to the government. In the absence of such information, Chapins behaved

reasonably in believing that Matthews' false claims would be accepted by her employer and

would ultimately result in fraud on the government. Accordingly, a reasonable jury could

find that Chapins engaged in protected conduct under the FCA.

## B. Retaliation

Section 3730(h)(1) entitles an employee to relief when that employee is "discharged,

demoted, suspended, threatened, harassed, or in any other manner discriminated against in

the terms and conditions of employment because of" acts protected by the FCA.

> Many courts analyze the issue of retaliation and pretext in FCA
> cases in the context similar to the McDonnell Douglas test,
> which states that once a plaintiff establishes a prima facie case
> of discrimination, the burden of production, not persuasion,
> shifts to the defendant to produce evidence of a legitimate,
> nondiscriminatory reason for the adverse action.[4]

---

[4] "The Fourth Circuit has not yet decided whether [the] McDonnell Douglas Corp. burden-shifting analysis applies to
whistleblower claims under the FCA, although other Circuits have." Wilson v. Raytheon Tech. Servs. Co., No. 1:12-cv-
1437, 2014 WL 12520031, at *4 n.9 (E.D. Va. Aug. 14, 2014) (citing Scott v. Metro Health Corp., 234 Fed. App'x 341,
346 (6th Cir. 2007)). This court uses the McDonnell Douglas framework, as the court in Wilson did, because it is widely
endorsed by other circuits, see, e.g., Diaz v. Kaplan Higher Educ., L.L.C., 820 F.3d 172, 175 (5th Cir. 2016); United

9

Dillon v. SAIC, Inc., No.1-12-cv-390, 2013 WL 324062, at *9 (E.D. Va. Jan. 28, 2013) (citations omitted). "Once a legitimate reason [for the challenged employment action] is articulated, the burden then shifts back to 'the plaintiff to prove that the proffered reason is merely a pretext and that retaliatory animus motivated the adverse action.'" Elkharwily v. Mayo Holding Co., 823 F.3d 462, 470 (8th Cir. 2016) (quoting Pedersen v. Bio–Med. Applications of Minn., 775 F.3d 1049, 1054 (8th Cir. 2015)).

Chapins essentially complains of three courses of retaliatory conduct. The first involves alleged harassment by Matthews' subordinates, Gleason and Kipler's failure to remedy said harassment, and Gleason's own "campaign of harassment," which, according to Chapins, temporarily ceased upon the intervention of CEO David Toth, but resumed when Toth retired. See ECF No. 1, ¶¶ 12–17. Second, Northwestern terminated Chapins when the TDT program was discontinued. Id. ¶ 18. Third, Northwestern failed to hire Chapins for the "Office Manager II" position, instead choosing another applicant with less relevant experience. Id. ¶¶ 20–22. Ultimately, the court must conclude that Chapins' evidence related to these three courses of conduct fails to demonstrate retaliation on the part of Northwestern.

### 1. Harassment at Work

Chapins complains that coworkers and supervisors retaliated against her through a campaign of harassment that began after she reported Matthews for fraud in 2011. Chapins' allegations in this regard are far from specific, and leave the court skeptical that she has

---

States ex rel. Schweizer v. Oce N.V., 677 F.3d 1228, 1240–41 (D.C. Cir. 2012); Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25 (1st Cir. 2012); Scott v. Metro Health Corp., 234 Fed. App'x 341, 346 (6th Cir. 2007), and because "the McDonnell Douglas approach fits comfortably with the test that courts generally apply to retaliation claims under section 3730(h)(1)." Harrington, 668 F.3d at 30.

10

shown that Northwestern did "something that 'well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'" Smith, 796 F.3d at 434 (quoting Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 67–68 (2015)). Chapins complains of "[c]ountless things" that demonstrate a pattern of retaliation by Northwestern, Chapins Dep. Tr., ECF No. 25, at 28:14, but her examples are unpersuasive. Matthews "no longer came to [her] office to request a document or she sent other people. Id. at 27:4–6. Matthews and coworkers aligned with Matthews "bad-mouth[ed her] to the TDT staff," "complained about [her] about nonexistent issues," and sent emails to Kibler "complain[ing] about various aspects of how [Chapins] handled a situation for her." Id. at 28:14–29:8. These complained-of activities, while likely frustrating, do not demonstrate a pattern of retaliation on the part of her employer; rather, they, at worst, imply discord among co-equal employees. Moreover, Chapins cites other acts that do not seem to be aimed at her or connected to her protected activity: coworkers "slam[med] doors," id. at 29:18, Matthews failed to notify the office of her location, id. at 30:13–14, and "yell[ed] . . . that the toaster oven had been left on" when "[s]he knew that [Chapins] was the one that left it on." Id. at 40:4–9.

Rather than demonstrating a pattern, these events seem too "isolated and ambiguous" to suggest retaliation by anyone, let alone Northwestern management. See O'Connor v. Consol. Coin Caterers Corp., 56 F.3d 542, 548–49 (4th Cir. 1995), rev'd on other grounds, 517 U.S. 308 (1996). Moreover, there is evidence that Northwestern took an active role in attempting to remedy the discord between Chapins and her coworkers. See Chapins Dep. Tr., ECF No. 25, at 25:17–26:1 ("After I made the report, I was told that . . . they were going to do whatever they could to protect the whistleblower being made [sic].");

11

Kibler Dep. Tr., ECF No. 24, at 31:7–9.

Regardless, the court need not decide the sufficiency of Chapins' claims because the vast majority of these events occurred outside the statutory limitations period. 31 U.S.C. § 3730(h)(3) requires that retaliation actions under the FCA "not be brought more than 3 years after the date when the retaliation occurred."[5] Chapins filed her complaint on May 23, 2016. See ECF No. 1. In her deposition, Chapins admits that the allegedly retaliatory conduct by coworkers "ended" after Clare Matthews and Julie Ebersole left Northwestern in "April or May" of 2012. Chapins Dep. Tr., ECF No. 25, at 113:13, 116:16. Thus, Chapins may not rely on the alleged retaliation of Chapins, Ebersole, or any other coworker—or, indeed, any other event that took place prior to May 23, 2013.

After removing the foregoing from consideration, it is clear that Chapins' remaining allegations as to actions taken prior to her termination are simply insufficient to establish retaliation under the FCA. That is because the only conduct Chapins complains of that could have taken place after May 2013 is largely attributable to Mark Gleason.[6] Chapins complains that Gleason made derogatory remarks to "[o]ne of his supervisees," Holly Markley. Chapins Dep. Tr., ECF No. 25, at 51:10–19. Though Chapins said that Markley relayed Gleason's comments to her, Chapins could not remember anything specific he said. Id. at 52:2–53:4.

---

[5] Northwestern claims that "[t]he FCA does not provide a specific limitations period for claims of retaliation." ECF No. 18, at 12. Instead, Northwestern, citing Graham, 545 U.S. at 422, and United States ex rel. Herndon v. Appalachian Reg. Cmty. Head Start, Inc., 572 F. Supp. 2d 663, 664 (W.D. Va. 2008), argues that "the most closely analogous state statute of limitations is to be used—in this case, the two year period provided by Va. Code Ann. §§ 8.01-243(A) and 8.01-248." ECF No. 18, at 12. Chapins at no point attempts to rebut this argument. See generally ECF Nos. 1, 19. But, Graham and Herndon were decided before Congress amended the FCA retaliation provision in 2010 to provide for a three-year limitations period. See Gilbert v. St. Rita's Prof'l Servs., LLC, No. 3:11cv2097, 2012 WL 2344583, at *4 (N.D. Ohio June 20, 2012). That neither party saw fit to refer to the plain text of the statute at issue in this case is surprising.
[6] Chapins does not state that Gleason's behavior took place after May 2013. However, she does claim that "after Toth's retirement, Gleason resumed his campaign of hostility." ECF No. 1, ¶ 17. Thus, viewed in the light most favorable to Chapins, it is reasonable to assume that this "campaign of hostility" included some conduct that took place after May 2013.

12

Other than this complaint of unspecified aspersions by Gleason, Chapins is silent on his alleged wrongdoing.[7]

Chapins has simply brought forward too little information to allow the court to conclude that these were any more than "stray or isolated comments unconnected to the employment decision"; thus, they "do not constitute direct evidence of retaliation." Glynn v. Impact Sci. & Tech., Inc., 807 F. Supp. 2d 391, 416 (D. Md. 2011) (citing O'Connor, 56 F. 3d at 548–49).

## 2. Chapins' Termination

Chapins claims that when Northwestern cancelled the TDT program in spring 2014, it "used this occasion" as pretext to justify terminating her in retaliation for her fraud allegations. ECF No. 1, ¶ 18. To support this argument, Chapins claims that her "salary and benefits were split equally between [four] programs," and, rather than terminating her, Northwestern could have "redistributed [her salary] to the other three [programs] that were successful."[8] Chapins Dep. Tr., ECF No. 25, at 86:12–16.

Chapins faces an uphill battle in her attempt to establish a prima facie case of retaliation. First, it is uncontested that the closure of the TDT program led Northwestern to terminate thirty-three other employees, see ECF No. 18, at 11—most or all of whom, presumably, did not engage in protected activity under the False Claims Act. As such, Chapins appears to admit that Northwestern's decision to scuttle the TDT program was nonpretextual, but argues that it was used as cover for the decision to retaliate against her.

---

[7] Of course Chapins also complains of Gleason's conduct during her termination and subsequent job interview. These allegations are discussed infra pp. 13–20.
[8] Northwestern disputes this narrative, and maintains that Chapins' funding came solely from the TDT program. See supra 2 n.2. Chapins admits that no one at Northwestern told her she was classified as a TDT employee in order to justify terminating her. Chapins Dep. Tr., ECF No. 25, at 91:18–20, 93:9–10.

13

See Chapins Dep. Tr., ECF No. 25, at 114:10–16 (acknowledging the TDT program was experiencing financial difficulties prior to closure). However, Chapins still faces the stark lack of temporal proximity between her protected conduct and Northwestern's adverse employment decision.

Chapins reported Matthews in February 2011, ECF No. 1, ¶ 10; she received notice of her termination on April 29, 2014, ECF No. 18, at 13. "[T]he discharge of an employee soon after [s]he engages in a protected activity is 'strongly suggestive of retaliatory motive,' and 'gives rise to a sufficient inference of causation to satisfy the prima facie requirement.'" Coursey v. Univ. of Md. E. Shore, 577 Fed. App'x 167, 175 (4th Cir. 2014) (internal citations omitted) (quoting Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994), and King v. Rumsfeld, 328 F.3d 450, 460 (4th Cir. 1994)). The converse is also true: "'[t]emporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation,' and '[t]he causal connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event.'" Feldman v. Law Enforcement Assocs. Corp., 752 F.3d 339, 348 (4th Cir. 2014) (brackets in original) (internal citations omitted) (quoting Tice v. Bristol–Myers Squibb Co., ALJ No. 2006-SOX-20, 2006 WL 3246825, at *20 (Dep't of Labor Mar. 4, 2004), and Halloum v. Intel Corp., ALJ No. 2003-SOX-7, 2004 WL 5032613, at *4–5 (Dep't of Labor Mar. 4, 2004)).

Thirty-eight months elapsed between Chapins' report on Matthews and her termination. This is longer than the twenty-month gap that the Fourth Circuit found in Feldman to represent a "complete absence" of temporal proximity, and longer still than the time periods contemplated in a host of opinions that declined to find temporal proximity.

14

Id.; see, e.g., Nifong v. SOC, LLC, No. 1:16-cv-63, 2017 WL 590290, at *12 (E.D. Va. Feb. 13, 2017) ("It is axiomatic in this circuit that a gap of three months . . . between a protected activity and adverse action is too long to infer a causal nexus."); Perry v. Kappos, 489 Fed. App'x 637, 643 (4th Cir. 2012) ("[A] three-month lapse is too long to establish causation, without more."). "Such a lengthy gap in time weighs against a finding that it is more likely than not that the alleged protected activities played a role in [her] termination." Feldman, 752 F.3d at 348.

In response, Chapins argues that "[t]emporal proximity is not the only measure of cause and effect." ECF No. 19, at 9. As an alternate measure, Chapins advances the declaration of Debbie A. Lupton, a former Northwestern employee who "believe[s] that Mark Gleason held a grudge against Kathy Chapins because of her reporting of Clare Matthews[] . . . and that grudge continued the remaining time of her employment." ECF No. 19-1, ¶ 4. Furthermore, Northwestern had options: instead of terminating Chapins, her salary "could have easily been redistributed to the other three [programs] that were successful." Chapins Dep. Tr., ECF No. 25, at 86:12–16.

In the face of the extremely long period between protected activity and termination, Chapins' arguments fail to establish a prima facie case of retaliation. Lupton's declaration, standing alone, is unconvincing. In fact, Lupton does not actually say that she believes Chapins was fired as a result of Gleason's grudge, only that the grudge "continued the remaining time of her employment." ECF No. 19-1, ¶ 4. This unsupported affidavit of a former employee does not "go beyond the 'mere existence of a scintilla of evidence'" necessary to survive summary judgment. Glynn, 710 F.3d at 213 (quoting Anderson, 477

15

Case 5:16-cv-00031-MFU-JCH Document 31 Filed 03/20/17 Page 15 of 24 Pageid#: 458

Id.; see, e.g., Nifong v. SOC, LLC, No. 1:16-cv-63, 2017 WL 590290, at *12 (E.D. Va. Feb. 13, 2017) ("It is axiomatic in this circuit that a gap of three months . . . between a protected activity and adverse action is too long to infer a causal nexus."); Perry v. Kappos, 489 Fed. App'x 637, 643 (4th Cir. 2012) ("[A] three-month lapse is too long to establish causation, without more."). "Such a lengthy gap in time weighs against a finding that it is more likely than not that the alleged protected activities played a role in [her] termination." Feldman, 752 F.3d at 348.

In response, Chapins argues that "[t]emporal proximity is not the only measure of cause and effect." ECF No. 19, at 9. As an alternate measure, Chapins advances the declaration of Debbie A. Lupton, a former Northwestern employee who "believe[s] that Mark Gleason held a grudge against Kathy Chapins because of her reporting of Clare Matthews[] . . . and that grudge continued the remaining time of her employment." ECF No. 19-1, ¶ 4. Furthermore, Northwestern had options: instead of terminating Chapins, her salary "could have easily been redistributed to the other three [programs] that were successful." Chapins Dep. Tr., ECF No. 25, at 86:12–16.

In the face of the extremely long period between protected activity and termination, Chapins' arguments fail to establish a prima facie case of retaliation. Lupton's declaration, standing alone, is unconvincing. In fact, Lupton does not actually say that she believes Chapins was fired as a result of Gleason's grudge, only that the grudge "continued the remaining time of her employment." ECF No. 19-1, ¶ 4. This unsupported affidavit of a former employee does not "go beyond the 'mere existence of a scintilla of evidence'" necessary to survive summary judgment. Glynn, 710 F.3d at 213 (quoting Anderson, 477

15

Case 5:16-cv-00031-MFU-JCH Document 31 Filed 03/20/17 Page 15 of 24 Pageid#: 458

U.S. at 252). Moreover, the decision to terminate the TDT program was not made by Gleason alone, but was shared between Gleason, CEO Buddy Hall, and financial manager Katie Russell. Kibler Dep. Tr., ECF No. 24, at 36:18–20. Meanwhile, Chapins suggested alternative—that her salary be redistributed among other programs—is irrelevant. Northwestern need not make the best or most accommodating employment decision, as long as its decision was not motivated by retaliatory animus.[9] See DeJarnette v. Corning Inc., 133 F.3d 293, 298 (4th Cir. 1998) ("When an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." (internal quotation marks omitted) (quoting Giannopoulos v. Brach & Brock Confections, Inc., 107 F.3d 406, 410–11 (7th Cir. 1997))); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000) (same). Northwestern could have continued to employ Chapins, but it was also free to decide not to, and, barring any material evidence of retaliatory intent, a court may not interfere with an employer's lawful practices.

### 3. The Office Manager II Position

Chapins argues that Northwestern's decision to not select her for another office manager position was retaliatory. In support, she points out that interviews were evaluated based entirely on subjective criteria, ECF No. 1, ¶ 26, "the tone set by Gleason and Kibler [in the interview] was hostile, intimidating, and antagonistic," id. ¶ 21, Gleason wore sunglasses in order to "not validate [Chapins] with eye contact," Chapins Dep. Tr., ECF No.

---

[9] For the same reason, Chapins' contention that the funding for her position was split between several programs (which Northwestern disputes) is immaterial. There is no disagreement over the fact that some of Chapins' funding came from the TDT program; moreover, Chapins spent a large percentage of her time servicing the TDT program. As such, when Northwestern cancelled the TDT program, it was free to conclude that maintaining Chapins' position, with fewer job duties and less funding with which to accomplish those duties, was no longer economically viable.

16

25, at 98:6–8, and the duties of the "Office Manager II" position were so similar to Chapins' former position that she was "basically applying for [her] own job again," id. at 98:20–22.

As an initial matter, that the lack of temporal proximity between Chapins' protected conduct and the decision not to re-hire her is more marked here than with Northwestern's termination decision, given that the decision not to rehire Chapins was made after she was terminated. Still, assuming arguendo that Chapins has made out a prima facie case of retaliation, the burden shifts to Northwestern to articulate a nonretaliatory reason for termination. See Dillon, 2013 WL 324062, at *9.

Northwestern has done so: Clark was chosen over Chapins because Clark "scored higher on the interview and . . . it was believed that she was a better fit for the position." ECF No. 18, at 2–3. This decision was ultimately made by Kibler, not Gleason. Kibler Dep. Tr., ECF No. 24, at 60:16–19. Despite being "very excited with how [Chapins] performed," and "concerned for [her] . . . knowing . . . that she had already been notified that her position was being eliminated," Kibler eventually chose the applicant with the higher interview scores. Id. at 60:1–8. To show that this justification was legitimate and not pretextual, Northwestern points out that Kibler delayed the hiring process specifically so that Chapins could apply—a measure she hardly would have taken if she never intended to take Chapins' application seriously. ECF No. 20, at 11. Moreover, Kibler actually recommended that Chapins receive the position if Clark declined it—again, an action inconsistent with any retaliatory motive. ECF No. 18, at 6.

Northwestern also contests Chapins' arguments. In her deposition as Northwestern's representative, Kibler acknowledged that "a lot of the duties were very similar" between the

17

Chapins' former position and the Office Manager II job. Kibler Dep. Tr., ECF No. 24, at 39:10–11. However, they were not identical: "unlike the TDT program, there wasn't a program supervisor that was involved and on-site on a regular basis. So when it came to certain functions, such as, . . . the doctor services and management of schedules and appointments, oftentimes decisions fell on the office manager in that position." Id. at 39:11–18. Moreover, Sarah Clark also had relevant experience: a change to Northwestern's software in April 2014 meant that "there weren't a whole lot of differences between [the] secretarial positions and [the] Office manager [I] level, due to the way the system was going to operate." Id. at 44:8–14. By contrast, Chapins' prior experience was supervisory in nature, whereas Clark, in her previous position as secretary in the Crisis Response Center, actually performed many of the tasks that were subsequently assigned to the Office Manager II position. Id. at 45:21–46:1, 47:3–8. As to the atmosphere in the interviews, Kibler recalls that both candidates were "nervous," but neither interview was more strained than the other. Id. at 49:19–50:6. Finally, Gleason wore sunglasses not to avoid validating Chapins with eye contact, but "to minimize the effects of a medical condition." ECF No. 20, at 8.

Given Northwestern's asserted reason for not rehiring her, the burden shifts back to Chapins to show that this reason was merely pretextual. Chapins largely repeats her earlier arguments: she was more experienced and had more relevant knowledge than Clark, the interview scoring system was wholly subjective,[10] her interview was antagonistic, and Gleason wore sunglasses. Recognizing that the "self-assessment of the plaintiff" is irrelevant

---

[10] Chapins also argues that "Gleason and Kibler did not follow standard policies and procedures in relying solely on the [interview] scores." ECF No. 19, at 11. She bases this assertion on her own understanding of Northwestern's hiring policies, and "fails to cite to any specific policy regarding the selection of applicants." ECF No. 20, at 10. Simply put, this "unsubstantiated" and "conclusory allegation[] do[es] not have sufficient 'probative force to reflect a genuine issue of material fact.'" Evans, 80 F.3d at 960 (quoting Goldberg v. B. Geren & Co., Inc., 836 F.2d 845, 848 (4th Cir. 1988)).

to a retaliation claim, Evans v. Techs. Apps. & Serv. Co., 80 F.3d 954, 960–61 (4th Cir. 1996), Chapins points to Lupton's characterization of her as "'vastly' more qualified than the other candidate, who is described as having minimal qualifications for the job." ECF No. 19, at 10 (quoting ECF No. 19-1, ¶¶ 8, 9).

Chapins has failed to demonstrate that Northwestern's decision was pretextual. For the most part, she reiterates arguments previously addressed by Northwestern. She claims she was qualified for the Office Manager II position, and Clark was not. However, she does nothing to rebut Northwestern's argument that changes in software and in the relevant job duties of the position meant that Clark in fact had qualifications Chapins lacked. Lupton's declaration cannot cure this defect, because Lupton only worked at Northwestern until August 2013, see ECF No. 19-1, ¶ 1, and thus would not have been privy to the changes that rendered Clark's experience germane.

Chapins' response to Northwestern's arguments is unconvincing. Chapins offers some (by no means uncontested) evidence that she would have been the better choice for the Office Manager II position. However, Northwestern was not obligated to choose the most experienced, or even best candidate. See Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005) (The court does "not sit as a 'super-personnel department weighing the prudence of employment decisions' made by the defendants." (quoting DeJarnette, 133 F.3d at 293)). Moreover, Chapins fails to show that Northwestern believed her to be the best candidate for the job. In fact, in the face of a thirty-eight month temporal gap between reporting Matthews and the job interview, Chapins supplies no evidence that her protected activity was actually in contemplation by Kibler, Gleason, or any

19

other member of Northwestern's management. By essentially standing on her pleadings, Chapins has failed to put forward any evidence that Northwestern's articulated justification for failing to rehire her was pretextual. The court **GRANTS** Northwestern's motion for summary judgment as to Chapins' FCA retaliation claim, and now turns to her claim of age discrimination under the ADEA.

## IV.

Under the ADEA, an employer may not "fail or refuse to hire . . . any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). "Age must be the 'but-for' cause of the employer's action for the action to violate the ADEA."[11] Buchhagen v. ICF Intern., Inc., 545 F. App'x 217, 220 (4th Cir. 2013) (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177–78 (2009)). "In assessing claims of age discrimination brought under the ADEA, the Fourth Circuit, like others, has applied some variant of the basic evidentiary framework set forth in McDonnell Douglas."[12] O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 311 (1996).

Importantly, Chapins does not challenge her termination under the ADEA, only Northwestern's failure to rehire her. See ECF No. 1, ¶ 33. Thus, in this context, Chapins bears the initial burden to make out a prima facie case of age discrimination by showing: "(1) [s]he is a member of the protected class (age forty or older); (2) [s]he applied for and was qualified for the position [s]he sought; (3) [Northwestern] rejected h[er]; and (4)

---

[11] Chapins argues that she need only demonstrate that age "was a motivating factor in the adverse decision." ECF No. 19, at 12 (citing Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004)). However, Hill was decided before the Supreme Court decided Gross, which required ADEA plaintiffs to demonstrate but-for causation. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177–78 (2009).

[12] In O'Connor, the Supreme Court assumed, without deciding, that the McDonnell Douglas evidentiary framework applies to ADEA cases. 517 U.S. at 311. "Nonetheless, the United States Court of Appeals for the Fourth Circuit has continued to apply it in that context . . . ." Cartee v. Wilbur Smith Assocs., Inc., No. 3:08-4132-JFA-PJG, 2010 WL 5059643, at 2 n.2 (D.S.C. Oct. 6, 2010) (collecting cases).

[Northwestern] hired another similarly situated individual for the position who was substantially younger than [her]." Zaccagnini v. Charles Levy Circulating Co., 338 F.3d 672, 675 (7th Cir. 2003).

As with Chapins' FCA retaliation claim, if she establishes a prima facie case, the burden shifts to Northwestern to "'rebut the presumption of discrimination' by producing evidence that the employment action in question was taken 'for a legitimate, nondiscriminatory reason.'" Stokes, 206 F.3d at 429 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)). If Northwestern meets this burden, "the presumption raised by the prima facie case is rebutted and 'drops from the case,' and [Chapins] then bears the ultimate burden of proving that [s]he has been the victim of intentional discrimination," and that the employer's articulated reason is pretext for age discrimination. Id. (quoting Burdine, 450 U.S. at 255 n.10). Even at the summary judgment stage,

> an employer would be entitled to judgment . . . if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000). Moreover, "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons" for the adverse employment decision. Dockins v. Benchmark Commc'ns, 176 F.3d 745, 749 (4th Cir. 1999) (internal quotation marks omitted) (quoting Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989).

The court is satisfied that Chapins has made out a prima facie case of age

21

discrimination. She pled that she was fifty-one years old at all times relevant to this complaint. ECF No. 1, ¶ 5. It is uncontested that she applied for the Office Manager II position, and, while Northwestern has contested Chapins' claim that she was "basically applying for [her] own job again," Chapins Dep. Tr., ECF No. 25, at 98:20–22, it has not claimed that she was unqualified for the position.[13] It is likewise uncontested that Chapins was not selected for the position. Finally, Chapins has claimed that Clark was seventeen years her junior, ECF No. 1, ¶ 25, and Northwestern has not disputed this figure. See ECF No. 20, at 9–10.

Accordingly, the burden shifts to Northwestern. Northwestern's proffered legitimate justification for the decision to hire Clark instead of Chapins is the same here as in the retaliation context: Clark received higher scores on the interview evaluation forms, and, given the applicants' approximately equivalent qualifications, Northwestern chose to offer the position to her. See supra pp. 17–18. Of particular moment here is the fact that Kibler delayed the hiring process to allow Chapins to apply, commented on how well Chapins interviewed, and recommended that Chapins be offered the position if Clark turned it down. See ECF No. 20, at 10–11; supra p. 22 n.13.

Thus, the final burden falls on Chapins; the question is whether she has provided enough evidence that she was a victim of age discrimination to allow a reasonable jury to find for her on her ADEA claim. Chapins' showing in this regard fails in the same way her retaliation claim failed. Chapins argues that Northwestern's decision was pretextual because

---

[13] Indeed, Northwestern would be hard pressed to do so, given that its personal representative, Barbara Kibler, delayed the hiring process to allow Chapins to apply, "comment[ed] how well [Chapins] had done in the interviews," and "spent a couple of days really pondering," before ultimately recommending that Chapins not be chosen for the position. Kibler Dep. Tr., ECF No. 24, at 54:2–11. In fact, Kibler recommended that Chapins receive the position if Clark had declined. ECF No. 18, at 6.

22

the scoring system was subjective, Clark was "noticeably younger than Chapins," and "Chapins had engaged in a considerable amount of training and mentoring of other staff," in contrast to Clark's lack of any management experience whatsoever. See ECF No. 19, at 12–13. In essence, Chapins continues to argue that Northwestern's hiring decision was incorrect (or that Northwestern would do better to develop objective standards for judging interviewees). Chapins "may not 'simply show the articulated reason is false; [s]he must also show that the employer discriminated against [her] on the basis of age.'" Wood v. Town of Warsaw, 914 F. Supp. 2d 735, 742 (E.D.N.C. 2012) (quoting Reeves, 530 U.S. at 147). Chapins presents little that suggests Northwestern's reason was false, and nothing that shows the decision to hire Clark was made on the impermissible basis of age, as she must to survive summary judgment. Whether under the ADEA or FCA, this court is not empowered to second guess the hiring decisions of employers absent an indication of impermissible motivation sufficient to survive summary judgment.

Moreover, Chapins continues to rely on the Lupton declaration, which is a slim reed indeed. As discussed supra, Lupton left Northwestern in August 2013, and thus would not have been privy to the changes in job description that rendered Clark's experience more germane (and Chapins' experience less so); nor could Lupton knowledgeably attest to Clark's lack of experience, given that Clark continued to accrue experience for at least eight months after Lupton left Northwestern. Lupton opines that "selection for the position was based upon factors other than qualifications," ECF No. 19-1, ¶ 8; however, she fails to present any reason to believe that the primary factor of which she speaks was age. Instead, she confines her declaration to supporting Chapins' FCA retaliation claims. See generally id. This vague,

23

unsupported allegation does not bolster Chapins' prima facie showing sufficiently to allow it to rebut Northwestern's proffered legitimate justification for its hiring decision. See Goldberg, 836 F.2d at 848.

"The ADEA is intended to prevent discrimination based on age, not to confer increased status upon those who become older." Buchhagen, 650 F. App'x at 830 (quoting Buchhagen v. ICF Intern., Inc., No. JFM-12-2470, 2015 WL 727947, at *2 (D. Md. Feb. 17, 2015)); see Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 512 (4th Cir. 1994) (The ADEA is not "a strict seniority protection mechanism."). Chapins demonstrated that she was not hired for a position, and a substantially younger coworker was. She has done nothing, however, to suggest that Northwestern's decision was motivated by the relative ages of the applicants. Because Chapins has entirely failed to show that Northwestern's proffered reason for hiring Clark was pretextual, the court **GRANTS** Northwestern's motion for summary judgment as to Chapins' ADEA claim.

## V.

For the foregoing reasons, the court **GRANTS** Northwestern's motion for summary judgment (ECF No. 17) in its entirety. An appropriate Order will be entered.

Entered: 03-20-2017

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge

24